IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PATRICIA DADOSKY, : | |
| : | |
| Plaintiff, : | Case No. 2:22-cv-02503 |
| : | |
| v. : | Judge Algenon L. Marbley |
| : | |
| MID-AMERICA CONVERSION : | Magistrate Judge Chelsey M. Vascura |
| SERVICES, LLC, and CRC : | |
| TECHNOLOGIES, INC., : | |
| : | |
| Defendants. : | |

**ORDER**

This Order addresses a discovery dispute that arose during Plaintiff Patricia Dadosky's deposition of Defendant Mid-America Conversion Services, LLC's ("MCS") representative on July 18, 2024. (*See* ECF Nos. 62, 63, 64, 65). Specifically, MCS has contended that discussions among members of its Accommodations Review Committee are protected by the attorney-client privilege and thus cannot be disclosed.

For the reasons set forth below, MCS is **DIRECTED** to submit for *in camera* inspection an affidavit and any supporting documentation setting forth in detail the substance of the communications of its Accommodations Review Committee meetings, focusing on the communications and the role of in-house counsel, **within fourteen (14) days** of this Order. Based on MCS's submission(s), this Court will determine whether the Accommodations Review Committee meeting discussions are protected by attorney-client privilege, as well as whether the privilege has been waived and, if so, to what extent.

1

## I. BACKGROUND

Plaintiff Patricia Dadosky worked at the Portsmouth Gaseous Diffusion Plant in Pike County, Ohio for nearly 28 years. (ECF No. 37 ¶ 14). The plant is operated by the U.S. Department of Energy ("DOE"). (*Id.* ¶ 13). Specifically, Ms. Dadosky was a Principal Project Controls Specialist for CRC Technologies, Inc. ("CRC"), a subcontractor for Mid-America Conversion Services ("MCS"), and assigned to work at MCS's Portsmouth site to provide project controls services to MCS by and through that subcontract. (ECF No. 37 ¶¶ 10–13). MCS is a prime contractor with DOE. (*Id.*; ECF No. 62-1 ¶ 2).

During Plaintiff's employment, on September 9, 2021, President Biden issued Executive Order 14042, requiring "parties that contract with the Federal Government to provide adequate COVID-19 safeguards to their workers . . . ." (ECF No. 37 ¶ 1). On September 24, 2021, the Safer Federal Workforce Task Force ("Task Force"), as directed in Executive Order 14042, issued guidance setting forth a deadline for federal contractor employees to be vaccinated, unless legally entitled to an accommodation for medical or religious reasons. (*Id.* ¶ 3). On or about October 13, 2021, MCS announced that all employees, including subcontractors at the Portsmouth site, must get a COVID-19 vaccine. (*Id.* ¶ 22). In line with the federal mandate, MCS provided an avenue for employees to request medical or religious accommodations to the vaccination requirement. (*Id.* ¶¶ 33–36). Accommodations were to be submitted through MCS by October 18, 2021. (*Id.*).

On October 17, 2021, Ms. Dadosky submitted an exemption request based on her Christian beliefs. (*Id.* ¶¶ 37–38). On October 21, 2021, she received a rejection letter via email informing her that her request was denied. (ECF No. 63 at 4; ECF No. 37 ¶ 40). Plaintiff was offered an opportunity to appeal the decision and appealed on or about October 26, 2021. (ECF No. 37 ¶ 41).

On October 28, 2021, Plaintiff received a verbal notice from Vincent Vitale, MCS Human Resources Director, that her appeal was denied. (*Id.* ¶ 42). On October 29, 2021, Plaintiff received a verbal notice from Michael Connor, CRC Human Resources Manager, that Plaintiff's final date of employment would be November 18, 2021 if she failed to take the vaccine. (*Id.* 43). On November 17, 2021, Plaintiff received an email from CRC stating her computer access would be terminated that afternoon which, according to Plaintiff, "was effectively[] [her] termination notice." (*Id.* ¶ 45).

On June 16, 2022, Plaintiff filed this action against CRC and MCS, alleging that Defendants failed to accommodate her religious beliefs and retaliated against her for engaging in protected activity in violation of Title VII, 42 U.S.C. § 2000e, *et seq*. (ECF No. 1). On June 7, 2023, upon obtaining leave of court, Plaintiff filed a Second Amended Complaint, asserting an additional claim of employment discrimination under Ohio Rev. Code § 4112.02. (*See* ECF No. 37 ¶¶ 51–71). On March 29, 2024, this Court denied Defendants' motions to dismiss. (ECF No. 55). After engaging in written discovery and agreeing on a Protective Order, Ms. Dadosky's deposition was taken and concluded on May 17, 2024. (ECF No. 62 at 2). On July 17, 2024, Plaintiff deposed CRC representatives Pasha Kane and Michael Conner. (*Id.*).

On July 18, 2024, Plaintiff was scheduled to depose MCS representatives Vincent Vitale and Peter Coutts. (*Id.*). The deposition of Mr. Vitale was not completed, however, due to discovery issues related to MCS's "Accommodations Review Committee" (the "Committee"), which consisted of "certain members of MCS's Management Team, human resources, and its in-house legal counsel." (ECF No. 62 at 2; *see* ECF No. 63 at 4 ("The Committee's membership consisted of in-house counsel and six MCS executives.")). Mr. Vitale, according to Plaintiff, testified that the Committee "met at least weekly during the period accommodations were considered," and

3

"that he sat in on every Committee meeting, took notes, and kept minutes." (ECF No. 63 at 3). During Mr. Vitale's deposition, MCS objected to the following questions by Plaintiff, asserting attorney-client privilege:

- "Do you recall the discussions that were had, within the Accommodation Committee, about Ms. Dadosky's request?"

- "Do you recall any discussion of the sincerity of her stated religious beliefs?"

- "Was the content of the request not discussed at all during these meetings?"

- "Why was no accommodation available to Ms. Dadosky?"

- "Do you remember whether the sincerity of [Ms. Dadosky's] belief was discussed?"

(ECF No. 62 at 4; ECF No. 63 at 5–6). That same day, on July 18, 2024, this Court held an emergency hearing to address Defendant's objections and assertion of attorney-client privilege. During the hearing, this Court ordered the parties to file limited briefs on their positions. The parties have since filed their respective briefs, as well as reply briefs, in support of their arguments. (ECF Nos. 62, 63, 64, 65). This matter is now ripe for resolution.[1]

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure contemplate broad discovery of "any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1) (emphasis added). The attorney-client privilege is recognized as the oldest privilege relating to confidential communications. *Upjohn v. United States,* 449 U.S. 383,

---

[1] Because the objections raised in Mr. Vitale's deposition were likely to be raised in the deposition of Mr. Coutts, who was identified as a member of the Committee, counsel for both parties agreed to resume both depositions after the Court resolves the objections herein. (ECF No. 63 at 3–4). On March 17, 2025, the parties jointly moved to modify the case schedule pending this Court's resolution of the objections (ECF No. 71), which Magistrate Judge Chelsey M. Vascura granted. (*See* ECF No. 72).

4

389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The purpose of the privilege is twofold: (1) to promote loyalty between lawyers and their clients; and (2) to encourage full disclosure by clients to their attorneys. *Reed v. Baxter,* 134 F.3d 351, 356 (6th Cir. 1998). Additionally, both "private corporations and other organizations may constitute clients for purposes of the attorney-client privilege." *Id*.

Because application of the privilege "excludes relevant evidence and stands 'in derogation of the search of the truth,'" *id*. (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974))*,* the privilege is applied narrowly to "protect[] only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976). The Sixth Circuit has outlined the elements of the attorney-client privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) unless the protection is waived.

*Reed,* 134 F.3d at 355–56 (citing *Fausek v. White,* 965 F.2d 126, 129 (6th Cir. 1992)). The party asserting the privilege bears the burden of demonstrating, by competent evidence and with particularity, that the privilege applies. *See United States v. Dakota,* 197 F.3d 821, 825 (6th Cir. 1999); *In re Behr Dayton Thermal Products, LLC*, 298 F.R.D. 369, 72 (S.D. Ohio 2013) (citing *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381–82 (6th Cir. 2009)); *Erickson v. Hocking Tech. Coll.*, No. 2:17-cv-360, 2018 WL 9414018, at *3 (S.D. Ohio Mar. 27, 2018); *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-03785-ALM-KAJ, 2024 WL 1984802, at *9 (S.D. Ohio May 6, 2024), *motion to certify appeal denied*, No. 2:20-CV-03785-ALM-KAJ, 2024 WL 3384864 (S.D. Ohio July 12, 2024); *see also* Fed. R. Civ. P. 26(b)(5). Blanket claims of privilege

or conclusory assertions are generally insufficient to carry this burden. *See United States v. Roxworthy*, 457 F.3d 590, 597 (6th Cir. 2006); *Erickson*, 2018 WL 9414018, at *3.

### III. LAW AND ANALYSIS

MCS argues that its objections should be sustained because the discussions that took place within the Accommodations Review Committee are protected by attorney-client privilege. According to MCS, "[t]his was the first and only time MCS has ever been ordered by the Federal government to vaccinate its employees, [] this was the first and only time MCS has ever had to evaluate accommodation requests to be exempt from such a Federal order[,] [and] MCS's General Counsel was heavily involved in this process." (ECF No. 62 at 2–3). Specifically, MCS contends that its Committee, comprising of select management personnel, human resources, and its legal counsel, was created "for the purpose of determining its legal rights with respect to the Federal Contractor Mandate – including the interpretation of that mandate as it relates to the vaccine requirement – and the related accommodation requests." (ECF No. 62 at 4). In support, MCS attaches a sworn declaration by Committee member Peter Coutts who attests that "[t]he purpose of the Accommodations Review Committee was to seek and receive legal advice from MCS's General Counsel regarding the implementation of the federal contractor vaccine mandate and how to address accommodations requested by MCS workers under the Americans with Disabilities Act and Title VII of the Civil Rights Act." (*See* Decl. of Peter Coutts [hereinafter Coutts Decl.] ¶ 6, ECF No. 62-1). According to MCS and Mr. Coutts, these meetings were limited to a select group of MCS employees, and neither Plaintiff nor third parties (e.g., CRC or DOE representatives) were in attendance. (*Id.* ¶¶ 5–7; ECF No. 62 at 4).

Plaintiff, on the other hand, contends that MCS's objections should be overruled because the attorney-client privilege does not apply. Specifically, Ms. Dadosky argues that the Committee

6

engaged in primarily a business function and its predominant purpose was to decide employment matters, specifically whether to grant Plaintiff's accommodation request or to terminate her. (ECF No. 62 at 9–10). Any participation by in-house counsel, according to Plaintiff, was incidental to that business function. (*Id.*). Plaintiff also argues that MCS waived attorney-client privilege because MCS's reasonableness in handling Ms. Dadosky's accommodation request is at issue as a matter of law, and "[i]f MCS asserts its decision was made in reliance on counsel, then MCS waives the privilege with respect to Committee discussions, including consideration of accommodations and why they could not be offered." (*Id.* at 14–16). In the alternative, if this Court finds that the attorney-client privilege applies, Plaintiff urges that "the privilege should not apply to the entirety of the Committee discussions." (*Id.* at 11). Rather, Plaintiff contends that she should be allowed to inquire into non-legal Committee discussions and the evidence that the Committee considered when denying Plaintiff's accommodation request. (*Id.* at 11–12). Plaintiff proposes asking the questions raised at Mr. Vitale's deposition "with a limiting instruction that conversations specific to legal advice may be withheld." (*Id.* at 11–12).

The first element of attorney-client privilege is that legal advice be sought. *See Reed*, 134 F.3d at 355. "[T]he fact that business considerations are weighed in the rendering of legal advice will not vitiate the attorney-client privilege." *In re OM Grp. Sec. Litig.*, 226 F.R.D. 579, 587 (N.D. Ohio 2005) (citing *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 685–86 (W.D. Mich. 1996)). But "[w]here business and legal advice are intertwined, the legal advice must predominate for the communication to be protected." *Alomari v. Ohio Dep't of Pub. Safety*, No. 2:11-CV-00613, 2013 WL 4499478, at *2 (S.D. Ohio Aug. 21, 2013) (*Alomari I*) (quoting *Neuder v. Battelle Pacific Northwest Natl. Laboratory*, 194 F.R.D. 289, 292 (D.D.C. 2000)). Thus, "[w]hen communications contain both legal advice and non-legal considerations, a court must

7

consider 'whether the predominant purpose of the communication is to render or solicit legal advice.'" *Cooey v. Strickland*, 269 F.R.D. 643, 650 (S.D. Ohio 2010) (quoting *Pritchard v. County of Erie (In re County of Erie)*, 473 F.3d 413, 420 (2d. Cir. 2007)). If the predominant purpose is legal advice, then "all portions of the communication, including the non-legal considerations, will be protected." *Id*. Relatedly, "communications by a corporation with its attorney, who at the time is acting solely in his capacity as a business advisor, would not be privileged." *See Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau*, 150 F.R.D. 193, 197 (D. Kan. 1993). In other words, "when the legal advice is merely incidental to business advice, the privilege does not apply." *Id*.

MCS maintains that the Accommodations Review Committee's purpose was to obtain legal advice regarding the accommodation requests it received and to determine MCS's legal rights with respect to the federal contractor mandate. It suggests that Plaintiff's argument that the purpose of the Committee was to obtain business advice is meritless, as "Plaintiff admits that she was not present during these meetings, has admitted that she has no knowledge of what was discussed, and does not even know who was on the Committee." (ECF No. 62 at 4 (citing Dadosky Dep. at 91-94, 103-104, 107-08, ECF No. 62-2)).

In support, MCS cites this Court's analysis in *Alomari v. Ohio Dep't of Pub. Safety*, 2014 WL 12651191 (S.D. Ohio June 19, 2014), which addressed a discovery dispute that arose after the plaintiff sought to disclose discussions held at two meetings in April 2010 and June 2010 as part of an internal investigation into the plaintiff's employment history. The case involved allegations by a former employee of Ohio Homeland Security ("OHS"), a division of Ohio Department of Public Safety ("ODPS"), that ODPS terminated him of his race, national origin, ethnicity, and religion, and in retaliation for his voiced opposition to OHS's anti-Muslim and anti-Arab counterterrorism training programs. *Id.* at *1. ODPS, the defendant-employer, maintained that it

8

terminated plaintiff following an administrative investigation into allegations that he omitted information about his past employment with, and termination from, Columbus State Community College when applying for the job at ODPS. *Id.*

The Magistrate Judge first determined that "the record demonstrates that the purpose of the April 2010 meeting was for counsel to ask Plaintiff questions so that she could advise ODPS how to respond to the media inquiries." *Alomari I*, 2013 WL 4499478, at *3. Specifically, the Magistrate Judge noted that "Plaintiff's supervisor testified that it was apparent from the media inquires that 'this was enough of an issue that we need to—or he needs to consult with legal and go from there,'" and "Plaintiff's testimony indicates that he was sufficiently aware that the purpose of the meeting was to provide information to counsel for this purpose." *Id.* The June 2010 meeting was attended by ODPS's director, assistant director, a member of human resources, a member of administration, the plaintiff's supervisor, the deputy chief of staff of public safety, and ODPS's counsel. *Id.* at *4. The Magistrate Judge could not make a determination at the time as to whether the discussions at that meeting were protected because "neither party has supplied evidence of the actual substance of the June 2010 communications," and thus "[t]he record contains insufficient information for the Court to determine whether the attorney-client privilege protects discussions that occurred at the June 2010 meeting." *Id.* Specifically, the Magistrate Judge was "unable to determine whether the relevant discussions were made to counsel in her capacity as legal advisor, or whether legal advice predominated among legal discussions intertwined with business communications." *Id.*

"Recognizing that Defendants carry the burden of demonstrating privilege, and in the interest of justice," the Magistrate Judge directed the defendants "to submit for *in camera* inspection an affidavit setting forth the substance of the June 2010 communications, focusing on

9

the communications and the role of in-house counsel." *Id.* In compliance with that order, the defendants submitted an affidavit from ODPS's counsel setting forth the substance of the discussions that occurred at the meeting, and the Magistrate Judge concluded, "based upon a thorough review of the affidavit and the parties' arguments, that the purpose of the meeting was to secure . . . legal advice related to the results of the administrative investigation." *See Alomari v. Ohio Dep't of Pub. Safety*, No. 2:11-CV-00613, 2013 WL 5180811, at *3 (S.D. Ohio Sept. 13, 2013) (*Alomari II*).

Over the plaintiff's objections, this Court affirmed the Magistrate Judge's conclusions in *Alomari I* and *Alomari II*, finding that the April 2010 meeting "was for counsel to ask Plaintiff questions so that she could advise ODPS on how to respond to the media inquiries," and that "the purpose of the [June 2010] meeting was to secure [ODPS's counsel] legal advice related to the results of the administrative investigation," thereby rendering both sets of communications privileged. *See Alomari*, 2014 WL 12651191, at *3–5 (internal quotation marks and citations omitted).

MCS contends that the Accommodations Review Committee meetings here are akin to the June 2010 meeting discussed in *Alomari*, *see* 2014 WL 12651191, at *5. Plaintiff disagrees, citing *Neuder*, 194 F.R.D. 289 and *Marten v. Yellow Freight Sys., Inc.*, No. Civ. A. 96-2013-GTV, 1998 WL 13244 (D. Kan. Jan. 6, 1998), for the proposition that "[w]hen a committee inquires about the legal implications of a proposed decision to terminate an employee, the business purpose of the decision predominates over the legal issues discussed." *See Neuder*, 194 F.R.D. at 293 (citing *Marten*, 1998 WL 13244, at *8).

In *Neuder*, a plaintiff filed a wrongful termination action against his employer, who asserted attorney-client privilege over documents prepared in connection with meetings held by

10

the employer's "Personnel Action Review Committee" ("PARC"), which had made the decision to terminate the plaintiff after convening two meetings to discuss the decision. *See* 194 F.R.D. at 291. The company's senior attorney attended both meetings and, as required by the company's bylaws, was one of the committee's members. *Id.* The court rejected the employer's argument that "because the PARC's purpose was predominantly legal, in-house counsel['s] [] advice was necessarily legal," finding that although legal review was one purpose for holding the meeting, the committee "served predominantly a business purpose—terminating the plaintiff," and in-house counsel's presence at the PARC meetings "did not make all documents generated and distributed in connection with the PARC privileged." *Id*.

The *Neuder* court relied on the reasoning in *Marten*, wherein the plaintiff sought the meetings minutes of a similar employment committee—the "Employee Review Committee" ("ERC")—where the defendant employer decided to place the plaintiff on probation or terminate or suspend him. 1998 WL 13244, at *2. The defendant there asserted the attorney-client privilege, stating, among other things, that one of the requested documents "contains material discussed between and among [defendant] employees and [in-house counsel] for purposes of rendering legal advice on how to address plaintiff's disciplinary problems." *Id*. The *Marten* court found that while the committee's review may include considerations of legal consequences of a proposed employment action, the primary function of the committee was to decide on an employment action to take against the employee. *Id*. at *8. Specifically, the court found that "[i]n the context of a required meeting to determine possible employment actions, legal advice sought or received during such meeting appears to be incidental to considerations of what is most prudent for the successful operation of the business." *Id*. The fact that the company's decision to terminate the plaintiff's employment had legal consequences, "together with the presence of legal counsel," did not

11

"convert the meeting into a conference between attorney and client" or "make the attorney-client privilege applicable to whatever is said and done during the meeting." *Id*. The court further observed that the attorney's membership on a committee deciding if an employee should be terminated "may lead to an inference that the attorney, at least in part, was acting in a non-legal capacity," and when "an attorney is a voting member, the indication is even stronger." *Id*. at *9.

Plaintiff asserts that Mr. Vitale's deposition testimony indicates that the purpose of MCS's Accommodations Review Committee was to decide on employment actions, specifically whether to accommodate or terminate Ms. Dadosky. (ECF No. 63 at 8–9). Plaintiff contends that, like the PARC in *Neuder* and ERC in *Marten*, the Accommodations Review Committee "served a predominantly business purpose," and in-house counsel "opin[ing] on the legalities of any proposed employment action does not shield the entire discussion from disclosure since the determination of employment actions against employees are business dealings." (ECF No. 63 at 9).

MCS further distinguishes *Neuder* and *Marten* on the facts. It asserts that, unlike the plaintiffs in those cases, Plaintiff was not an employee of MCS—she was an employee of CRC. (ECF No. 65 at 3). According to MCS, the Committee was not deciding in these meetings whether to terminate Plaintiff, but "whether MCS could accommodate Plaintiff under the Federal Contractor Mandate (a legal analysis) absent an undue hardship (a legal analysis) or direct threat to the health and safety of the Company and its workers (a legal analysis)." (*Id.*). MCS maintains that, unlike *Neuder* and *Marten*, "there was not an employment action as a result of the [Accommodations Review] Committee meetings with respect to Plaintiff." (*Id.*). According to MCS, these Committee meetings were thus "not held for the purpose of making business decisions (or to make employment decisions for that matter), but were for the predominant, primary, and ultimate purpose of discussing with MCS's General Counsel the legal implications of the federal

12

contractor vaccination mandate and various workers' requests to be legally accommodated under the Americans with Disabilities Act and Title VII of the Civil Rights Act." (*Id.*).

While the Accommodations Review Committee does appear distinguishable from the PARC and ERC considered in *Neuder* and *Marten* on the grounds that MCS identifies, MCS fails to carry its burden to show that the Committee discussions Plaintiff seeks to disclose were for the purpose of rendering or soliciting legal advice. *See Cooey,* 269 F.R.D. at 648 ("The party asserting the privilege bears the burden of establishing the existence of the privilege." (citing *Dakota*, 197 F.3d at 825)); *see also United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) ("[I]f the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of the legal requirements for application of the privilege, his claim will be rejected." (quoting *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y.1993)). As both parties recognize, "the mere fact that [MCS's] in-house counsel [was] present at a [Committee] meeting does not shield otherwise unprivileged communications from disclosure." *Neuder*, 194 F.R.D. at 293. The attorney-client privilege "applies only to communications made to [MCS's] attorney in [her] capacity as legal advisor." *Id.* at 292; *see In re FirstEnergy*, 2024 WL 1984802, at *11 ("Whether the internal investigation's purpose was primarily business or human resources-related is crucial in determining whether the privilege exists, because the investigation's predominant purpose must be legal for the privilege to apply.").

Unlike the defendants in *Alomari*, MCS did not provide an affidavit from its in-house counsel "regarding the content of the [Accommodations Review Committee] discussions" that this Court can rely on to determine the purpose of the meetings. *Id.* MCS only provides an affidavit from Mr. Coutts, who was not in-house counsel. The affidavit provides no information about the content of Committee meetings and asserts only a general purpose in support of attorney-client

13

privilege. (*See* Coutts Decl. ¶¶ 5–6, ECF No. 62-1 ("The purpose of the Accommodations Review Committee was to seek and receive legal advice from MCS's General Counsel regarding the implementation of the federal contractor vaccine mandate and how to address accommodations requested by MCS workers under the Americans with Disabilities Act and Title VII of the Civil Rights Act . . . . My understanding is that the Company considered these meetings to be protected by the attorney client privilege, and I myself considered these meetings to be protected by the attorney-client privilege.").

This Court, like the *Neuder* court, is reticent to credit MCS's "self-serving declaration," which, in any event, "does not suffice to establish that [MCS's counsel] was acting in a legal capacity as a[n] [Accommodations Review Committee] member." *Neuder*, 194 F.R.D. at 294; *see also In re FirstEnergy*, 2024 WL 1984802, at *11 (rejecting defendant's assertion of attorney-client privilege where defendant "did not provide specifics on 'when, where, how, to whom, and in what manner' legal advice was communicated during the internal investigations and therefore failed to meet its burden" (quoting *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 104 (S.D.N.Y. 2007)); *cf. Alomari*, 2014 WL 12651191, at *4 (affirming the Magistrate Judge's application of attorney-client privilege to April 2010 meeting because the Magistrate Judge "did not merely rely on one party's subjective belief as to whether the communication is privileged," but also on "on the testimony of Plaintiff and Plaintiff's supervisor"); *id.* at *5 (affirming the Magistrate Judge's application of attorney-client privilege to June 2010 meeting because the Magistrate Judge, "[a]fter reviewing ODPS in-house counsel['s] . . . affidavit regarding the content of the June 2010 discussions and both parties' arguments, . . . concluded that the record supports that the communications are privileged," and "the affidavit clarified [counsel's] role as legal

14

advisor at the meeting, which the Magistrate Judge properly reviewed in determining the June 2010 discussions were privileged").

Accordingly, given the deficiency of the record at this time, this Court will allow MCS to submit additional evidence clarifying the basis of the attorney-client privilege as it relates to the Accommodations Review Committee meetings. MCS is therefore **DIRECTED** to submit for *in camera* inspection an affidavit and any supporting documentation setting forth in detail the substance of the communications of the Accommodations Review Committee meetings, focusing on the communications and the role of in-house counsel. Based on MCS's submission, this Court will determine whether the Accommodations Review Committee discussions are protected by attorney-client privilege, as well as whether the privilege has been waived and to what extent.

## IV. CONCLUSION

For the reasons set forth above, MCS is **DIRECTED**, **within fourteen (14) days of this Order**, to submit for *in camera* inspection an affidavit and any supporting documentation setting forth in detail the substance of the communications of the Accommodations Review Committee meetings, focusing on the communications and the role of in-house counsel.

**IT IS SO ORDERED**.

_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: April 14, 2025**